## Case No. 13,486.

### STONE et al. v. The RELAMPAGO.

[2 U. S. Mag. 42.] [1]

District Court, S. D. Florida. Dec., 1849.

ADMIRALTY JURISDICTION — CARRIERS OF PASSENGERS—SHIPWRECK—PASSAGE MONEY —ACTION FOR.

1. A contract to transport a passenger in a ship or vessel on the high seas or on tide waters is a maritime contract, and within the jurisdiction of the admiralty.

2. A passenger who has paid his passage money in advance is entitled to recover it back, or to recover damages for the non-fulfilment of the contract, caused by shipwreck or other casualty, unless he has contracted to take upon himself the risks of the voyage.

3. Passage money is like freight, or is freight; and to entitle the owner to it, he must fulfil his contract by carrying the passenger to the port of destination.

4. If the voyage be interrupted by shipwreck or other disaster, the master or owner may hire another vessel, or repair his own, and so fulfil his contract. If he determine to repair, the passenger is bound to wait a reasonable time for such repairs to be made.

5. But, if the voyage be interrupted in consequence of an original defect and unseaworthiness of the vessel, the passenger is not bound to wait for repairs to be made, but may treat the contract as void, ab initio, and may immediately demand a return of his passage money paid in advance.

6. The maritime law gives to passengers a lien on the ship as security; and they may maintain a suit in rem as well as in personam.

7. The owner binds the ship by his contract with the passenger; and the master binds the ship by his contract, whenever he has authority, express or implied, to carry passengers.

[This was a libel by Alden Stone, Williams, and others against the schooner Relampago (Wakeman, master), to recover passage money.]

A. Gordon, for Williams.
S. R. Mallory, for respondent.

[1] [Reported by Hon. William Marvin, District Judge.]

MARVIN, District Judge. This suit was instituted by the libellants, late passengers on board the schooner Relampago, bound on a voyage from New Orleans to San Francisco, in California, to recover back the passage money paid by them in advance to the owner in New Orleans; the voyage having been broken up at this port, in consequence of the unseaworthiness of the vessel. She was unseaworthy when she left New Orleans, as was made evident by a survey in this port.

The master of the Relampago claims the vessel for the owner, and objects to the maintenance of this suit on various grounds.

1. It is objected that passage money paid in advance is not recoverable back on a failure of the voyage; and that the suit is commenced prematurely. The validity of this objection depends upon the terms of the contract. Undoubtedly, a passenger or a freighter may agree to pay passage money or freight in advance, and take upon himself the risks and chances of the completion of the voyage. And, if there be a well established and known usage, that passage money or freight paid in advance, is not to be returned upon the failure of the voyage, the passenger or freighter may be considered as having agreed to such usage, and made it a part of his contract, unless he stipulated to the contrary. Abb. Shipp. 214, 407, 408; 4 Camp. 241. In such cases the contract makes the law. But if the contract is silent upon the subject, then I think that passage money paid in advance may be recovered back upon shipwreck or other accident breaking up the voyage; or upon any failure of the master or ship-owner to fulfil the contract on his part, to carry the passenger to his port of destination. Passage money and freight, in this respect, stand upon the same footing, and are governed by the same principles. They are the same thing. Howland v. The Lavinia [Case No. 6,797]; Holt, Shipp. 451; Rocen's notes 2 and 80. To entitle the master or ship-owner to freight or passage money, he must fulfil the contract on his part, by conveying the goods or passenger to the port of destination, unless prevented by some act of the owner or passenger. If the ship be interrupted in her voyage at an intermediate port, by reason of sea damage or other disaster, the master may hire another vessel to convey the goods or passenger, or repair his own ship (and for this purpose he is entitled to reasonable time); and thus complete the voyage and earn his freight or passage money. The passenger must wait a reasonable time for such repairs to be made. Abb. Shipp. 434. In such case of disaster, if the merchant voluntarily accept his goods, or if the passenger do not insist upon being carried on, he must pay freight pro rata itineris. But if the voyage be interrupted or broken up in consequence of an original unseaworthiness of the vessel, the passenger is not to wait for repairs to be

made, or for the hire of another vessel; for the implied warranty of seaworthiness on the part of the master and owner, being broken in the very inception of the voyage, the passenger may treat the contract as void ab initio, and demand an immediate return of passage money, paid in advance. Abb. Shipp. pt. 4, c. 5, §§ 1, 340; 3 Mass. 485. Such is the fact in this case. The vessel was unseaworthy at the time of the commencement of the voyage; and in consequence thereof, and not because of any sea damage or disaster, she put into this port in a leaky condition. I think the passengers are entitled to a return of the passage money paid in advance; and that they are not bound to wait here for advices from the owner, and that, both upon the ground of unreasonable delay and original unseaworthiness, the suit is not prematurely brought.

2. The second objection is that the suit is not of admiralty jurisdiction. The subject matter or foundation of the suit is a contract to carry passengers in a vessel on the high seas, and is like a contract to carry merchandise. The contract is, I think, a maritime contract (Chamberlain v. Chandler [Case No. 2,575]), over which the court has jurisdiction (Dunl. Adm. Prac. 92). See. also, The Volunteer [Case No. 16,991]; Certain Logs of Mahogany [Id. 2,559]; Drinkwater v. The Spartan [Id. 4,085]; The Tribune [Id. 14,171]; [New Jersey Steam Nav. Co. v. Mechanics' Bank] 6 How. [47 U. S.] 344,— as to the jurisdiction of the court over contracts to carry merchandise upon the high seas.

3. The third objection to be considered is, that these passengers have not a lien upon the vessel, as a security for the fulfilment of the contract to carry them to San Francisco. The suit is in rem, and unless the libellants have such lien, their libel cannot be maintained. No such lien is created by any special terms of the contract, and, if any exist, it must be created by the law. Does the law create a lien on the ship in favor of the passengers? I cannot learn that this question has ever been decided in the American courts. By the English law no such lien is held to exist; or, rather, no such lien, if it do exist, can be made available in consequence of a defect of jurisdiction in the English admiralty court to enforce it. Abb. Shipp. pt. 2, cc. 2, 127. But the jurisdiction of the American admiralty courts is more comprehensive than that of the English admiralty. [New Jersey. Steam Nav. Co. v. Mechanics' Bank] 6 How. [47 U. S.] 344. Their jurisdiction extends to enforce all maritime liens. So that the question in the present case is, does the maritime lien exist in favor of these passengers? If so, this court is competent to enforce it.

In Brackett v. The Hercules [Case No. 1,762]. Judge Hopkinson said, arguendo, that the contract with a passenger was a personal contract, suable only at common law. The point was not before him for decision, and the remark is an obiter dictum. It appears to me that the remark is true only in a qualified, and not in a general, sense.

If a passenger agrees for his passage with the master of a ship, not usually employed in the business of carrying passengers, but in transporting merchandise, I admit that such contract would neither bind the ship nor the owner, but the master only; for it would not be within the general range of the master's authority, as master of a ship so employed, to contract to carry passengers. In such a case the contract is personal with the master; and, although I think it cognisable in the admiralty as being a maritime contract, yet the suit for a breach of it must be in personam against the master, and not against the ship or owner. Most contracts for carrying passengers have been of this character until within the last twenty or thirty years, and many are so still. Thirty years ago but few ships were built with a view to the transportation of passengers, or were employed in the business of carrying passengers. Many of them carried passengers, it is true, but it was not a part of their regular business or employment to do so. The owner did not regard the little passage money that was received as any part of the profits or earnings of his ship, but allowed the master to receive it, as a kind of perquisite or emolument of his office; the latter, on his own account, furnishing the passengers with stores, provisions, &c. In short, the cabin was small, and was deemed the master's or master's and mate's, and built for their accommodation; and he admitted into it, or refused to admit into it, passengers at his option. If he received a passenger, the passenger either furnished himself with provisions, &c., or the master supplied him on his own account, and charged them to the passenger. The transaction was a personal one with the master, with which the owner had nothing to do. Such are still the character and the nature of the employment of many ships; and, as to such, the contract of the passenger, unless made expressly with the owner, would be deemed to be a personal contract made with the master, and would not bind the owner or the ship. But the business of commerce and navigation, and the character of ships generally, have very much changed in latter years. Within the last twenty years many ships have been built and navigated with express reference to the business and employment of carrying passengers, as well as of carrying cargo. They are constructed with large cabins, and fitted up by the owner with costly accommodations for passengers; and passage money constitutes a large portion, and, in some voyages, the only earnings of the ship. Steam ships and packet sail ships are, in many cases, mostly supported by their receipts of passage money. Now, as to this class of vessels so employed

in the business of carrying passengers, in voyages made upon the high seas, the contract made by the master to carry a passenger becomes, in my judgment, no longer a personal contract binding himself only, but a contract made within the range of his authority, as master, and binding upon the ship and owner. By the general maritime law, every contract of the master, within the scope of his authority as master, binds the vessel, and gives the creditor a lien upon it for his security. The Paragon [Case No. 10,708].

In the present case, however, the question of the master's authority to bind the owner and ship by his contract is not involved, for the contract was made by the owner himself; and the question is, does his contract with the passenger bind the ship? This point, I before remarked, is undecided so far as I can learn. But, so far as this point of lien is concerned, is there any difference, in principle, between the effect that ought to be given to a contract for carrying merchandise and one for carrying passengers? The ship carries both for freight. In common parlance, the money received for carrying a passenger is called passage money, but it is as much freight as money received for carrying goods. Suppose the ship, as in this very case, carries no cargo, but the owner fills her hold with passengers, instead of cargo, is not the passage money freight, and to be considered and treated as such? Now, as to the contract contained in a bill of lading, a charter party, or made by parol, to carry merchandise, the rule of the maritime law is: "The ship is bound to the merchandise, and the merchandise to the ship." By the marine law, the ship and freight are bound to the performance of the covenants of the ship-owner, and the goods to the performance of the covenants of the merchant. Abb. Shipp. pt. 4, cc. 2, 284. The latter branch of this rule, that the merchandise is bound to the ship, or, in other words, that the ship owner has a lien on the goods for freight, is well illustrated and enforced in the case of The Volunteer [Case No. 16,991], and in Certain Logs of Mahogany [Id. 2,559]; and although a passenger may not be bound in his person to the ship, or a lien may not exist upon him as upon a bale of cotton, for a very obvious reason, yet his baggage is bound to the ship, and a lien exists upon it for his passage money. Abb. Shipp. pt. 2, c. 8, §§ 2, 217; 2 Camp. 631. I fancy that a slave carried as a passenger would be bound to the ship for passage money. The other branch of this rule, that the ship is bound to the merchandise, has been illustrated and enforced in several American cases.

In the case of The Rebecca [Case No. 11,619], the libellant proceeded against the ship to recover the value of ten hogsheads of liquor shipped on board of the Rebecca, and lost in her voyage from New York to Portland. The master had stowed the liquor on deck.

The vessel was, by the decree of the court, held liable for the loss. So, also, in the case of The Phebe [Id. 11,064], which was a libel against the vessel for the value of 136 tons of gypsum, shipped on board the vessel, and not delivered according to the bill of lading. The court held the vessel liable for the value of the gypsum, although the vessel was a hired or chartered one at the time of the shipment, and not in the possession or employment of the owner. The vessel in specie, no matter who is owner, is bound to the merchandise. The same principle was acted on in the case of The Paragon [supra]. In this case Judge Ware said that, "by the general maritime law, every contract of the master within the scope of his authority as master binds the vessel, and gives the creditor a lien upon it for his security." A fortiori, the contract of the owner binds the vessel. In the case of The Tribune [Case No. 14,171], Justice Story carried the principle of the vessel's being bound to the goods still further. In that case the master had agreed with the libellant to take in a cargo for him in Maine, and proceed to Havana, and back for five hundred dollars a month, for the use of the vessel. The master had commenced the fulfilment of the contract, by taking in a part of the cargo, when the owners ordered him to unload and abandon the voyage. The libellant instituted a suit in admiralty against the vessel, to recover damages for the nonfulfilment of the contract; and the court held the vessel liable.

These cases show that from the time the contract is made the vessel and the goods are reciprocally bound to each other. Now, if the ship is bound by a charter party, a bill of lading, or a mere parol contract, to the shipper of merchandise, for the fulfilment of the contract to carry the merchandise for money, upon what principle is it that it is not equally bound by a like contract to the passenger to carry him for money? The merchant may charter the whole ship, or, in a general ship, each shipper may be regarded as a charterer of so much of the ship as his goods may occupy, and the ship is held liable to the one or several charterers. So, in this case, these passengers, thirty-six in all, have in fact—though not by a regularly drawn up charter party—chartered the entire ship from the owner, not to carry cargo, but to carry themselves; and they have paid him in freight, or passage money, for the use and hire of the whole vessel, the owner retaining the possession by the appointment of a master. I think the vessel is as much bound to these passengers to fulfil the contract made with them, by the owner, to carry them to San Francisco, as it would be bound to them to carry their merchandise; and that the passengers have a lien, and may proceed in the admiralty, against the vessel, to recover damages for the non-fulfilment of the contract, or to recover back the passage money paid in advance.

A question was made on the trial whether the passengers' lien extended also to the stores and the provisions on board belonging to the vessel, and purchased for her use. I have no doubt that it does. The term "vessel" or "ship" includes the idea of an entire thing made up of many parts,—the hull, anchors, chains, rigging, sails, boats, stores and provisions, and all other things provided and intended for her use, or for the use of the crew and passengers, which may, in common parlance, fairly be said to belong to her, and without which she would not be completely furnished for the particular voyage upon which she is to enter, or has entered. In an armed ship, the armament constitutes a part of the ship. All these are insured under the name of ship (Phil. Ins. 321), and contribute as a part of the ship in a general average (Id. 359), and are bound by, and included within, the meaning of the words "ship, tackle, apparel and furniture," used in admiralty attachments, and so subjected to judicial sale in proceedings in rem. The Dundee, 1 Hag. Adm. 109.

The decree must be for a sale of the vessel and provisions to satisfy the demand of the passengers—in whole or in part.